## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

UNITED STATES OF AMERICA,

v.                                                      CASE NO.: 4:19-cr-3

JOHN DI BLASI,

        Defendant.

## O R D E R

This matter comes before the Court on Defendant John Di Blasi's Motion for Return of Property. (Doc. 36.) For the reasons stated below, the Court **DENIES** Defendant's Motion. (Id.) Additionally, in his pleadings regarding this Motion, Defendant also takes issue with the Court's prior Order, (doc. 42), denying his Motion for Release from Custody, (doc. 40). (See doc. 43, pp. 2–3.) The Court construes this as a Motion for Reconsideration and **DENIES** that Motion as well.[1]

The Court notes at the outset that Defendant's statements made in his recent Response, (doc. 43), deeply trouble the Court. His pleadings reveal a delusional lack of remorse that directly contradicts the acceptance of responsibility he previously expressed during his plea and sentencing

---

[1] Defendant also includes a "MOTION to REMOVE DOJ Website LIES and FAKE NEWS" in his Response. (Doc. 43, p. 2.) Therein, he claims that the Department of Justice's website and news outlets have published falsehoods about his case. (Id.) Defendant claims that the damages resulting from these publications "are so immense that [his] litigating capabilities against the government and others will surmount huge damages." (Id.) He requests that the Court order the Department of Justice and media outlets to remove "all content regarding [his] case." (Id.) Defendant has failed to cite any legal authority for the Court to grant this motion or to explain how this request is properly before the Court. Moreover, pretermitting the constitutional concerns inherent in his request, Defendant has failed to plausibly allege that any of these entities have published falsehoods about him. It appears these entities have simply published the well-established details of Defendant's crimes which he previously admitted. In seeking removal of these publications, Defendant simply makes conclusory allegations on par with his other delusional denials of his own criminality. For all of these reasons, the Court **DENIES** this Motion.

proceedings.  Defendant blames his wife, law enforcement agents, his attorney, and this Court for his circumstances.  Defendant's circumstances are solely attributable to his own criminality, and he has no one to blame but himself.  If Defendant continues to shirk responsibility, he will pose an increasing danger to himself and his community.  Thus, the Court urges Defendant to heed the warnings below as well as the encouragement the Court gave to him at his sentencing hearing.

## BACKGROUND

On March 6, 2019, Defendant pleaded guilty to conspiracy to unlawfully dispense oxycodone in violation of 21 U.S.C. § 846.  (Docs. 17, 18.)  The Court accepted Defendant's guilty plea after an extensive colloquy during which Defendant testified under oath, among other things, that he understood his rights, that he had no complaints about his lawyer whatsoever, that no one had coerced him, intimidated him, or promised him anything to induce him to plead guilty, and that he was pleading guilty freely and voluntarily because he was in fact guilty of conspiring to unlawfully distribute oxycodone.

After his guilty plea, the United States Probation Office produced a thorough presentence investigation report ("PSIR").  (Doc. 24.)  The PSIR detailed Defendant's prolific and shameful history of abusing his position of trust as a physician to unlawfully distribute dangerous and addictive drugs for illicit use.  (Id. at pp. 4–11.)  Defendant contributed to this community's prescription-drug-abuse crisis by selling illegitimate prescriptions to multiple individuals, who then used those prescriptions to obtain controlled substances, which they then sold on the black market.  (Id.)  Defendant's unlawful orders included controlled substance prescriptions for at least 433 "patients" for whom he did not have a corresponding electronic medical record, individuals from eleven states outside of Georgia, and even one person who was incarcerated when Defendant wrote multiple prescriptions in the individual's name.  (Id. at pp. 9–10.)  Also emblematic of

Defendant's criminality was his writing prescriptions for a female and her husband while Defendant used cocaine with the female in Defendant's hotel room.  (Id. at p. 8.)

The PSIR indicated that Defendant demonstrated remorse and accepted responsibility for his deplorable actions prior to sentencing.  (Id. at pp. 11–12.)  Defendant provided a proffer to law enforcement agents in advance of his sentencing hearing pursuant to United States Sentencing Guidelines § 1B1.8.  (Id. at pp. 12–14.)  During the proffer, he acknowledged that he formed a conspiracy whereby his coconspirator would provide Defendant with a list of individuals' names and Defendant would issue fraudulent controlled substance prescriptions in those names in exchange for a fee.  (Id. at p. 13.)  Defendant stated that these prescriptions were typically for opioid medications such as oxycodone and hydrocodone.  (Id.)  Defendant also admitted that he would despicably write prescriptions for several females in exchange for the females providing him with sexual favors.  (Id.)  The PSIR contained the following statement of remorse from Defendant:

> Regretfully, I prescribed medication inappropriately to patients in an inappropriate manner, not consistent with my morals nor the standards of medical care.  I violated the public trust given to me with the privileges of being a physician.  I allowed some patients to participate in a scheme in which they sold their medications, while I accepted compensation for doing so.  I am very sorry I abused my prescribing privileges which have been justly revoked.  For the Lord giveth wisdom: out of mouth cometh knowledge and understanding. Proverbs  2:6[.]

(Id. at p. 11.)  Based on that statement, the Probation Office recommended that Defendant's offense level under the United States Sentencing Guidelines be reduced for his acceptance of responsibility.  (Id. at pp. 11–12.)

The Court held a sentencing hearing in this case on June 13, 2019.  (Doc. 29.)  At that hearing, Defendant once again appeared to express genuine remorse for his reprehensible conduct.  Based on his contrition as well as other factors, the Court sentenced Defendant to thirty-three

months of imprisonment, a sentence below the sentencing range recommended by the Guidelines, and well below the maximum twenty-year penalty established by Congress for his crime.  (Doc. 33, p. 2; see also doc. 24, p. 23.)  Defendant is currently serving his sentence on home confinement.

On April 6, 2020, Defendant filed a Motion for Return of Property pursuant to Federal Rule of Criminal Procedure 41(g).  (Doc. 36.)  He sought the return of specified items taken from his medical clinic by law enforcement officers during the investigation of this case as well as personal property taken from him during his arrest at the Miami International Airport.  (Id. at pp. 4, 6.)  In its Order of October 16, 2020, the Court noted that the Motion for Return of Property appeared moot because, according to the Government's responses, the Drug Enforcement Agency ("DEA") had returned most of Defendant's property that it had seized to Defendant or to his wife and disposed of the remaining property in accordance with the DEA's standard procedures.  (Doc. 42, pp. 2–3.)  However, in an abundance of caution, the Court afforded Defendant an opportunity to provide additional evidence and argument to the Court on his Motion.  (Id.)

In his Response to the Court's Order, Defendant focused on items that were seized from him upon his arrest.  (Doc. 43, p. 1.)  He contended, among other things, that his wife did not have permission to receive these items, that the return of these items has not been documented, and that his wife claims to not have the items.  (Id.)  The Government filed a Reply disputing these contentions.  (Doc. 44.)  The Government attached to its Reply a DEA Report of Investigation summarizing four conversations pertinent to Defendant's Motion for Return of Property: a November 23, 2020, telephone call between DEA Special Agent Eric Kruger and Defendant's wife and three telephone calls between Defendant and his wife on January 18, 2019.  (Doc. 44-2.)  The Court ordered the Government to file electronic recordings of these calls, (doc. 45), and the Government complied with that directive, (doc. 46).

4

Defendant also filed a Motion for Release from Custody on August 18, 2020.  (Doc. 40.)  In its October 16, 2020, Order, the Court denied that Motion.  (Doc. 42, pp. 3–9.)  The Court held that Defendant had failed to pursue his available administrative remedies, and that, even if Defendant's Motion for Release were ripe, the Court would deny it on the merits.  (Id.)  In his Response to the Court's Order, Defendant took issue with the Court's ruling and asked that the Court "end [his] entire sentence" upon his exhaustion of his administrative remedies.  (Doc. 43, p. 2–3.)

Within his Response, Defendant also made several statements that contradict his prior remorsefulness before the Court.  He claimed that the Government brought "false charges" against him and that his plea agreement was "coerced."  (Id. at p. 2.)  He made numerous claims against **DEA Agent Kruger,** including claims that Kruger "manipulat[ed his] case details," "illegally coerced" Defendant's wife to testify against him, and committed "misbehavior . . . in all manners regarding the investigation, the defamation of [Defendant's] practice, and in the mishandling of all [Defendant's] property."  (Id. at pp. 1, 3.)  Additionally, Defendant contended that "fake media news outlets (online and in print) as well as the Department of Justice website published multiple lies and fake news about [his] case," and he moved the Court to order these entities to remove all media content about his case.  (Id. at p. 2.)

## DISCUSSION

I.     **Defendant's Motion for Return of Property**

Federal Rule of Criminal Procedure 41(g) provides:

A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return.  The motion must be filed in the district where the property was seized.  The court must receive evidence on any factual issue necessary to decide the motion.  If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

"This rule not only provides recourse for persons aggrieved by the unlawful seizure of personal property, but also when lawfully seized property is unreasonably retained by the government." United States v. Zambrano, 353 F. App'x 227, 228 (11th Cir. 2009).  When a defendant files a motion for return of property after the close of criminal proceedings, as Defendant has done here, the Court must construe the motion as a civil action in equity.  United States v. Howell, 425 F.3d 971, 974 (11th Cir. 2005).  To obtain relief under Rule 41(g), a claimant must show that he has a possessory interest in the property he seeks, and he must show that he has "clean hands."  Id. Additionally, the Eleventh Circuit Court of Appeals has held that even where property has been destroyed, the Court may fashion some equitable relief for the Rule 41(g) claimant.  United States v. Potes Ramirez, 260 F.3d 1310, 1314–15 (11th Cir. 2001).  However, a Rule 41(g) claimant cannot recover monetary damages.  Id. at 1315–16.

"The government is not obligated to return property that it never possessed or no longer possesses, but it must provide some evidentiary support for its claim that it does not possess the property at issue."  United States v. Davis, 789 F. App'x 105, 109 (11th Cir. 2019).  Thus, the Court cannot rely upon a "bald assertion" by the Government that property has been destroyed or lost.  United States v. Melquiades, 394 F. App'x 578, 581 (11th Cir. 2010) (citing Potes Ramirez, 260 F.3d at 1314).  Nonetheless, where the undisputed facts demonstrate that a claimant is not entitled to relief under Rule 41(g), the Court is not obligated to hold an evidentiary hearing prior to denying the motion.  United States v. Prat, 584 F. App'x 921, 925 (11th Cir. 2014).

In his Motion, Defendant sought the return of two categories of property: items seized from his former medical clinic on June 28, 2018, (doc. 36, p. 4), and items taken from him during his arrest on December 24, 2018, (id. at p. 6).  The Court will address each category in turn.

A.      **Items Seized from Defendant's Former Medical Clinic**

In his Motion, Defendant requested the return of four electronic devices seized from his former medical clinic: "Clover Merchant Services Unit Touchpad; HP Desktop Computer Tower; ASUS Tablet (Computer); [and] Cellular Phone . . . ." (Id. at p. 4.)  In its Initial Response, the Government explained that it could return the following electronic devices to Defendant that were seized from the clinic: "(1) Clover Station Tablet (S/N C0104Q64210178) (DEA N-16); (2) Dell Computer Tower with power cord, Model D15M, CN-079V5-1-7 (DEA N-14); (3) Asus Google Chromebook (S/N F7NLCX07476S29F) (DEA N-15); (4) ZTE Flip Cellphone with power cord (S/N 329F66043C77) (DEA N-13)."  (Doc. 38, p. 3.)  The descriptions of these devices appear to correspond to the four devices requested by Defendant.   In its Supplemental Response, the Government confirmed that it released these four electronic devices to Defendant on July 22, 2020. (Doc. 39, p. 2.)  Additionally, in his Response to the Court's Order, Defendant conceded that DEA Agents returned these items to him.  (Doc. 43, p. 1.)  Indeed, he attached documentation of this return to his Response.  (Id. at p. 4.)  Consequently, the Court **DENIES AS MOOT** Defendant's Motion for Return as to these four items.  (Doc. 36.)

In his Motion, Defendant also listed the following three categories of additional items which he claimed agents seized from his former medical clinic: (1) "Misc[ellaneous] Patient Files/Office Records;" (2) "Contents of Safe/Lockbox/Desk Drawers (with the exception of medications);" and (3) "[a]ny other items seized and listed in the evidence/property log signed by DEA Special Agent Eric Kruger."  (Doc. 36, p. 4.)  As an initial matter, Defendant's descriptions of these three categories are so broad that he has not established what the items are, much less that he has a property interest in them.  Moreover, in its Initial Response, the Government explained that items falling within these categories "have been or will be destroyed pursuant to DEA's

evidence policy and protocol." (Doc. 38, p. 3.)  In its Supplemental Response, the Government

confirmed that this property has been destroyed.  (Doc. 39, p. 2.)  In his Response to the Court's

Order, Defendant did not contest the Government's assertion that these items were lawfully

destroyed.  (See doc. 43.)  He abandoned any request for items falling within these categories and

instead focused solely on the items that were seized from him during his arrest.  (Id.)

Thus, it is undisputed that the Government lawfully destroyed any items falling within

these three categories, and the Court need not receive any additional evidence regarding these

items. See United States v. Foster, 635 F. App'x 818, 823 (11th Cir. 2015) ("Finally, the district

court was not required to hold an evidentiary hearing before ruling on [defendant's] motion.  The

district court gave the parties the opportunity to submit evidence, and the material facts were not

in dispute.").  The Court cannot order the Government to return items to Defendant that no longer

exist.  Additionally, while the Court may fashion some alternative equitable relief even after the

destruction of items, "Defendant does not request, and the Court is not aware of, an equitable

remedy to compensate Defendant for his destroyed [items]." United States v. Ilori, No. 1:10-cr-

193-WSD, 2014 WL 5148207, at *3 (N.D. Ga. Oct. 14, 2014); see also United States v. Foster,

CIV. A. No. 1:08-MJ-274-TWT, 2015 WL 1279228, at *5 (N.D. Ga. Mar. 20, 2015) ("Neither an

injunction nor specific performance—traditional equitable remedies—would be effective to afford

[defendant] any relief from his loss of the personal items that were destroyed. Simply put,

[defendant] is not entitled to any relief because the government cannot return the property that has

been destroyed . . . and money damages are not an option, even if there were a basis for liability.").

Furthermore, "[e]ven if Defendant requested equitable relief, he did not come to the Court with

clean hands and is not entitled to equitable relief." Ilori, No. 1:10-cr-193-WSD, 2014 WL

5148207, at *3.  For all these reasons, the Court **DENIES** Defendant's Motion for Return of Property as to any additional items seized from his former medical clinic.[2]  (Doc. 36.)

> **B.      Items Seized from Defendant During his Arrest**

In his Motion, Defendant sought the return of the following items that he contends agents seized from him during his arrest at the Miami International Airport on December 24, 2018:

- 3 Suitcases (clothing/personal effects)[;]
- 1 Dufflebag (clothing/medical supplies)[;]
- 1 Rolling Carry-On Bag (containing HP Laptop Computer, Apple Ipad, misc. valuables including Bulova watch, Gucci watch, Movado watch, Rolex watch, wedding band, et cetera)[;]
- 1 Stetson Cowboy Hat[;]
- 1 Suede Leather Sportscoat[;]
- Custom Gold watch with Free Mason logo[;]
- 1 Apple Iphone w/ wallet case[;]
- 2 Forms of Identification (GA Drivers [sic] License and U.S. Passport)[;]
- 1 Leather Belt with Gold Buckle[;]
- Cash in the approximate amount of $7,800[; and]
- Any other items seized by arresting agents from Di Blasi at Miami International Airport prior to transport to FDC Miami.

(Doc. 36, p. 6.)

In its Initial Response, the Government explained that it could return the following electronic devices to Defendant that were taken during his arrest: "(1) white Apple IPhone with charging block, black cell phone cord (N-36); and (2) black flash drive located in black business bag (N-37)."  (Doc. 38, pp. 3–4.)  In its Supplemental Response, the Government confirmed that it released these two electronic devices to Defendant on July 22, 2020.  (Doc. 39, p. 2.)  Defendant

---

[2]  As explained below, during one of his conversations with his wife on January 18, 2019, Defendant asked his wife to retrieve personal items from his office and spoke at length with her about her efforts to close his medical clinic, including having her make decisions regarding storage, sale, and disposal of his property. (See doc. 46-4.)  The Court cites this conversation below in Section I.B of this Order to rebut Defendant's claim that his wife did not have his permission to retrieve any of his personal property, including those items seized from him during his arrest.  However, these discussions also cut against Defendant's claim, which he now appears to have abandoned, that the Government is somehow responsible for items taken from his medical clinic.

conceded that DEA Agents returned these items to him in his Response to the Court's Order, and he attached documentation of this return to his Response.  (Doc. 43, pp. 1, 4.)  Consequently, the Court **DENIES AS MOOT** Defendant's Motion for Return as to these two electronic devices. (Doc. 36.)

As to the other items that were seized from Defendant at the Miami International Airport, the Government has consistently maintained that those items, "specifically including his luggage and all personal effects, such as U.S. currency, computers, tablet, watches, clothing, identification documents, cowboy hat, and leather belt, were returned to Defendant's wife, Melissa Di Blasi, on January 18, 2019[,] at the Chatham County Narcotics Team office at 71 Ross Road, Savannah, Georgia 31405." (Doc. 38, p. 4; see also doc. 44, pp. 2–3.)  Therefore, the Government contends, it cannot return these items to Defendant because it no longer possesses them.  (Doc. 38, p. 4.) Though Defendant has not directly contested that law enforcement agents returned these items to his wife, he has called the Government's explanation into question.  In his Response to the Court's Order, Defendant claims "these items were not documented as returned [to his wife] nor was she given permission to receive these items." (Doc. 43, p. 1.)  He also alleges that his wife "claims to not have the items." (Id.)  Defendant alleges that the Government's treatment of his belongings was part of a conspiracy to covertly steal his property while he was detained.  (Id. at pp. 1–2.)

The evidence produced by the Government entirely disproves Defendant's contentions. According to the DEA's Report of Investigation, on January 18, 2019, a task force officer gave Defendant's luggage, cash, and other personal belongings to Defendant's wife at the Chatham County Narcotics Team's office in Savannah, Georgia.  (Doc. 44-1, p. 3.)  Additionally, the Government has filed a recording of a November 23, 2020, telephone conversation between Defendant's wife and DEA Agent Kruger regarding this return.  (Doc. 46-5.)  On that call,

Defendant's wife confirmed that Defendant told her to pick up the items that were seized from him during his arrest and that she indeed picked up those items from law enforcement on January 18, 2019.  (Id.)

The Government has also filed recordings of three telephone conversations between Defendant and his wife on the date she retrieved his personal items.[3]  (Docs. 46-2, 46-3, 46-4.) Those recordings capture Defendant repeatedly expressing appreciation that his wife retrieved his items from the DEA and advising her to spend the money returned to her to pay bills.  (Id.) The following excerpts are emblematic of Defendant's statements regarding the return of his property:

DEFENDANT: Oh, you're picking up all my personal belongings from DEA?

WIFE: Yeah, I already have.

DEFENDANT: What?

WIFE: That's what I just did.

DEFENDANT: Oh my god, do you have the money too?

WIFE: Yes.

DEFENDANT: Ah, that's awesome. God, that's awesome. Thank you so much. … I'm wondering why they did that so fast.  I mean, I'm not, I'm not, I'm happy but holy [expletive].  Good, now you got money to catch up on some bills.  Be careful

---

[3]  The Court cites to each call in the order it occurred as "Call One," "Call Two," or "Call Three."  Audio recordings of these calls are filed with the Court as follows: Call One is filed at doc. 46-2, Call Two is filed at doc. 46-3, and Call Three is filed at doc. 46-4.  For each excerpt, the Court cites to the pertinent playback time stamps within the respective recording.  Call Three occurred during an in-person visitation between Defendant and his wife at the Liberty County Jail.  It appears Defendant and his wife spoke to one another while separated by a clear glass partition using the jail's internal phone system.  Additionally, it is clear from the recordings that Defendant and his wife understood their conversations were being recorded.  Call Three includes a recorded statement that informs the parties that the call may be recorded or monitored, (Call Three at 0:00–0:02), and at other points, Defendant is careful not to discuss his illegal activities.  (See, e.g., id. at 13:36–13:42) ("We're not talking about my case on recording.  I was told not to ever talk about it again on the phone by an attorney.").)

with it, spread it out.  Um, can you do me a favor?  That's amazing.  That's awesome!  Wow.

(Call One at 0:39–1:19.)

DEFENDANT: And thank you for getting that stuff and thank god.  That is a huge, huge thing off my chest that that money is now in your hands.  Did you count it?

WIFE: No, I haven't.

DEFENDANT: What?

WIFE: No, I haven't counted it yet.

DEFENDANT: But, it's in a sealed thing, right?

WIFE: Yes.

(Id. at 6:01–6:39.)

DEFENDANT: I'm just glad that you got my personal, you know, personal things.  That's a big thing off my list of concerns, because now you can pay the mortgage and you can get other bills caught up, and that's one humongous less thing that we have to worry about until the attorney [unintelligible].  So, I'm glad that you got that money, but like I said, stretch it out, don't live off of it.

(Id. at 7:38–8:14.)

DEFENDANT:  I'm just glad I got my property back.

(Call Two at 5:08.)

WIFE: Yes, you were [wearing your watch when you were arrested] because it was in, what was on your person was in a separate bag from everything else [when I received your property] and you did, you had your Bulova watch on.

. . .

DEFENDANT: I wasn't wearing a gold watch or anything fancy.

WIFE: Bulova, yeah, you were.

DEFENDANT: I don't remember.  I was also drunk.

(Call Three at 11:17–12:07.)

DEFENDANT: I was wearing my boots, I was wearing my cowboy hat.  Did you get all that back?

WIFE: They kept your phone, a thumb drive or flash drive, and some documents and paperwork.

DEFENDANT: Did they give you paperwork showing that they kept it?

WIFE: Yep.

. . .

DEFENDANT: What about my laptop?

WIFE: I got your laptop.

DEFENDANT: Take it.  They kept my phone, though?

WIFE: Yep.

. . .

DEFENDANT: They don't have a right to keep my phone.

WIFE: They do.  It says evidence. They got that, they got that, the documents, and [unintelligible].

DEFENDANT: They can't get in my phone.  I'm not worried about the phone.  My attorney will get that back.

WIFE: Your attorney don't want to touch any of that.  . . .  They're going to have to turn it over to me.  I don't know what documents.  You had some documents in

13

your, in your carry on, and then they said that, you know, in the list of what they

kept was documents, paperwork, um [unintelligible].

(Id. at 12:11–13:23.)

WIFE: Everything that belongs to you belongs to your spouse [unintelligible].

DEFENDANT: Fine. You're my spouse. I'm glad. I couldn't have a better spouse.

I have a wonderful spouse.

(Id. at 14:09–14:17.)

DEFENDANT: . . . Make that money stretch, please. Pay the mortgage. That's

definitely important.

WIFE: I got to pay for my class.

DEFENDANT: Yeah pay for, I was going to say that too. Pay for that class [so

that you can get] yourself an eyelash making business. You'll do great. You should

buy one of those little vinyl signs for the side of the Mercedes. Melissa's Mobile,

whatever you want to call it, Mobile Lashes, or call it some, you, you're creative.

(Id. at 20:09–20:33.)

DEFENDANT: Just stretch that money really hard baby. Until we get that money

from the lawyer.

(Id. at 23:22–23:26.)

DEFENDANT: Um, like I said, just really, really be like Jewish prudent on that

money because until we get . . .

WIFE: I've always been the one.

. . .

DEFENDANT: I'm not saying don't get your nails done babe.  I'm, I'm.  You should, you should do that.  That makes you feel better. That's not terribly high expense, that's not a terribly high expense.

(Id. at 23:54–24:23.)

Additionally, during the third call, Defendant and his wife repeatedly discussed how to wrap up his business and terminate the lease for his office.  Defendant clearly permitted her to act on his behalf, including during the following excerpts:

DEFENDANT: Hey can you get that office cleaned out if they're not, if we're not going to renew the lease under a new business? There's so much stuff in there that needs to go, put it in my garage.

WIFE: Tim and I, Tim and I talked about different options or whatever.

DEFENDANT: Just get it in the garage.  Probably just going to walk away, right?

WIFE: Well, it all depends.

(Id. at 21:02–21:19.)

DEFENDANT: There's a lot of valuable stuff in there.  What I would use, take the um, you know the three-thousand-dollar table, the up and down table, I might want to keep that for after, unless you can get a good sale for it, you know, a good buyer for it.

(Id. at 21:33–21:48.)

DEFENDANT: Not to get on the business subject too much but get the stuff out of that office.  There's, there's bookshelves, all my books, get my personal stuff, all our pictures, I hope you already got those.  Did you get those yet or no? Like my D.O. thing that's hanging on the wall.

WIFE:  I took all that off so that Josh could take it to New York but he didn't want

anything.

DEFENDANT: I'm glad he didn't take it, that's our stuff.  And we're staying

together.  We're going to have that stuff as a memory from our future.  I'm sorry.

Even [unintelligible] and Pappa's picture, I want that in our house someday

whenever we go wherever we go, even if we get an RV.

(Id. at 22:37–23:07.)

DEFENDANT: Um, also, like I said, I'm just, I hate to sound like I'm anxious

about getting stuff out of the office, but there's a lot of stuff in that office that I just,

WIFE: I know. They're not gonna', they're not gonna' not let us get it.

DEFENDANT: I don't want them, I don't want them to lock me out.

. . .

WIFE: Well, Tim and I have already discussed it, you know. If, if you'll just be a

little patient with us. But we'll,

DEFENDANT: You'll get it done.

(Id. at 24:53–25:14.)

Defendant's statements throughout these three conversations reveal that he lied to the Court

when he asserted that his wife was not "given permission to receive these items" and that she

"claims to not have the items."  (Doc. 43, p. 1.)[4]  Defendant was obviously aware that his wife

retrieved the items in question, and at no point during these calls (or otherwise) did he express any

---

[4]  Defendant has historically maintained a complicated relationship with the truth.  For instance, he
previously lied on his physician profile that he submitted to the Georgia Composite Medical Board for
licensure.  (Doc. 24, p. 6.)  Defendant deceitfully included several military awards/qualifications on his
profile that he had not earned, including a claim that he received the Silver Star, the United States Armed
Force's third highest personal decoration for valor in combat, despite having never served in combat.  (Id.)

objection or even misgivings as to her having obtained his property.  To the contrary, he repeatedly expressed his elation and appreciation that she retrieved the items.  He even agreed with her statement that "everything" that belongs to him also belongs to her, (Call Three at 14:09–4:17), and he referred to items within his office as "our stuff," (id. at 22:37–23:07).  Further, Defendant expressly authorized his wife to spend the money returned to her and to make decisions regarding his personal property including retrieving and selling additional items from his office.  This evidence belies his recent and bizarre claim that the Government somehow conspired with his wife to allow her to steal his personal property and money.

The four phone calls, (docs. 46-2, 46-3, 46-4, and 46-5), and Reports of Investigation, (docs. 44-1, 44-2), unequivocally establish that law enforcement agents returned the items in question to Defendant's wife and that the Government is no longer in possession of any of Defendant's personal property.  Defendant has not produced any contradictory evidence.  Though the Court may still fashion some form of equitable relief when the Government is no longer in possession of items a Rule 41(g) claimant seeks, see Potes Ramirez, 260 F.3d at 1314–15, no such relief is warranted here.  Defendant "does not ask for any equitable relief" and "sovereign immunity protects the government from money damages sought under Rule 41(g)."  Foster, 635 F. App'x at 823 (citing Potes Ramirez, 260 F.3d at 1315–16).  Moreover, traditional equitable remedies would not provide Defendant any relief.  See Ilori, No. 1:10-cr-193-WSD, 2014 WL 5148207, at *3; Foster, CIV. A. No. 1:08-MJ-274-TWT, 2015 WL 1279228, at *5.

Even if Defendant had made a request for equitable remedies, the Court has discretion to decline to exercise jurisdiction over that request, "and jurisdiction is generally appropriate 'only when the petitioner's conduct and the merits of his petition require judicial review to prevent manifest injustice.'"  Zambrano, 353 F. App'x at 228 (quoting United States v. Eubanks, 169 F.3d

672, 674 (11th Cir. 1999)).  Defendant has not come close to demonstrating a threat of manifest injustice.  Law enforcement agents returned the items in question to Defendant's wife, and his own statements on the telephone calls prove that he approved of that return.  Further, "there are precious few equities [the Court] can discern that cut in [Defendant's] favor, and indeed, so many equities that cut so heavily against him."  Zambrano, 353 F. App'x at 229.  The seizure of Defendant's property was directly caused by his own abhorrent criminal conduct.[5]  He had unclean hands prior to filing the instant Motion, and he has now further sullied them by lying to this Court.

Further, Defendant waited to file his Rule 41(g) Motion until April 6, 2020, more than a year and three months after his arrest and more than a year and two months after the items in question were returned.  As detailed above, Defendant was clearly aware that his wife had retrieved his items on the very day she retrieved them.  If that retrieval was somehow improper, he should have raised his concerns at that time.  By the time Defendant filed his Motion, it was too late for the Court to remedy any impropriety.  Thus, the doctrine of laches further bars any equitable claim Defendant could make.  See Foster, 635 F. App'x at 823 (affirming district court's determination that laches barred Rule 41(g) claim for equitable relief where defendant's delay in seeking return of property contributed to the DEA's decision to destroy property).

For all these reasons, the Court **DENIES** Defendant's Motion for the return of items that were seized from him during his arrest.  (Doc. 36.)

---

[5]  Items were seized from Defendant during his arrest on December 24, 2018, at the Miami International Airport where he was waiting to board a flight to Bogota, Columbia.  (See Doc. 24, p. 11.)  Defendant claimed he was flying to Columbia to avoid someone who had been stalking him.  (Id. at p. 14.)  This claim is specious at best.  At that time, the DEA had been investigating Defendant for months, including a search of his medical clinic, (id. at pp. 4–10); Defendant had told his business partner that he was concerned that DEA agents had interviewed one of his former employees, (id. at p. 6); and he had already been arrested on state charges for lying to detectives about his prescribing practices, (id. at p. 16).  Thus, Defendant well understood that he would soon face the consequences of his criminal conduct.  Moreover, by his own admission, Defendant planned his flight to Columbia under the influence of cocaine and in possession of a large amount of cash.  (Id. at p. 14.)  These facts bear all the hallmarks of a man running from the law.

II.     **Defendant's Motion to Reconsider Denial of Motion for Release**

On October 16, 2020, the Court denied Defendant's Motion for Release from Custody. (Doc. 42.)  In that Order, the Court construed Defendant's Motion as a request for compassionate release under the First Step Act at 18 U.S.C. § 3582(c)(1)(A).  (Id. at p. 5.)  The Court explained that Defendant failed to meet the first of four prerequisites for relief under Section 3582(c)(1)(A) as he had failed to exhaust his available administrative remedies.  (Id. at pp. 6–7.)  Moreover, the Court found that, even if Defendant had exhausted his administrative remedies, he failed to meet Section 3582(c)(1)(A)'s other prerequisites as he had not established any extraordinary and compelling reason for his release and he had not demonstrated that his release would be consistent with the Sentencing Commission's Policy Statements and the sentencing factors of Section 3553(a).  (Id. at pp. 7–9.)  Defendant now asks the Court to grant him release "upon the exhaustion of administrative remedies within the BOP."  (Doc. 43, p. 2.)  The Court construes these arguments as a request for the Court to reconsider its prior denial of Defendant's Motion for Release.

As an initial matter, it is not clear what standard of review should be applied to this request. See United States v. Gossett, 671 F. App'x 748, 749 (11th Cir. 2016) ("We have not addressed in a published opinion under what circumstances a district court should grant a motion to reconsider in a criminal case.").  However, even under a *de novo* standard, the Court would deny Defendant's putative motion for reconsideration.   Defendant concedes that he still has not pursued his administrative remedies from the BOP.  (Doc. 43, p. 3 ("I shall request from the BOP all administrative remedies possible for my early release from confinement and probation [sic].").)  Thus, his request for the Court to grant him relief upon such exhaustion is obviously not ripe.

Defendant contends that the Court's calculation of the time that he has served towards his sentence was "fundamentally and mathematically incorrect."  (Id. at pp. 2–3.)  Defendant points

out that the Court did not include the time he spent in custody between his December 24, 2018, arrest, and his June 13, 2019, sentencing.  The Court's prior Order stated that "after serving less than a year of [his thirty-three month sentence], Di Blasi has now received the additional benefit of being able to serve his sentence on home confinement."  (Doc. 42, p. 9.)  It appears that Defendant is correct and that, including his presentence detention, he was incarcerated for approximately fifteen months (as opposed to "less than a year") before being allowed to serve his sentence on home confinement.  Nonetheless, the Court's failure to include Defendant's presentence detention in its calculation of his time served was harmless.  The total fifteen months Defendant spent incarcerated is still far below the twenty-year-maximum sentence established by Congress for his crime and well below the thirty-seven to forty-six months of imprisonment recommended by the United States Sentencing Guidelines in this case.  (See doc. 24, p. 23.)

Further, Defendant has not established an extraordinary and compelling reason for his release or that his release would be consistent with the Sentencing Commission's Policy Statements and Section 3553(a).  Indeed, given Defendant's statements in his Response to the Court's Order, (doc. 43), the Court is now even more convinced that reducing his sentence would contravene Section 3553(a)'s factors.  Having received a relatively brief sentence and then the exceedingly rare benefit of being allowed to serve a portion of that sentence on home confinement, Defendant entirely fails to appreciate these windfalls.  Rather, in his Response to the Court's Order, he refuses to acknowledge his own crimes, contends he was wrongfully prosecuted, bemoans the service of his sentence, and contends he is entitled to have his sentence reduced even further.  (Id. at pp. 2–3.)  Defendant's indignance is galling considering the untold damage he caused to countless victims by illegally disseminating dangerous and highly addictive drugs under the guise of a practitioner who was entrusted with others' wellbeing.  Defendant appears to be a walking

contradiction of the Hippocratic Oath.  Additionally, his lack of remorse is especially galling to the Court that sentenced him to a shorter term of imprisonment based on his apparent acceptance of responsibility.  Given the now revealed fallacy of Defendant's prior statements of remorse, if the Court had the occasion and authority to revisit his sentence, considering the sentencing factors of Section 3553(a), the Court would increase—not reduce—his period of incarceration.

## CONCLUSION

The Court has far too often observed criminal defendants fail to acknowledge the seriousness of their crimes and refuse to take responsibility for their own transgressions.  These defendants blame others for their convictions, sentences, and the other consequences of their own criminal conduct.  It is the Court's experience that such defendants who fail to own up to their own criminality have a higher chance of recidivism, frequently violate the conditions of their supervised release, and often fail to successfully reenter society after serving their sentences.  Defendant is currently travelling that well-worn path.  The Court forewarns Defendant that if he does not reach a point of honesty, he will likely return to a life of victimizing others and find himself facing an even greater sentence than he received in this case and of which he now complains.  The Court sincerely hopes he chooses a different path.

For the reasons set forth above, the Court **DENIES** Defendant's Motion for Return of Property, (doc. 36), and **DENIES** his implied Motion for Reconsideration, (doc. 43, pp. 2–3).

**SO ORDERED**, this 2nd day of March, 2021.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA